IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GAIL SHIPMAN, et al.,                    :        CIVIL ACTION

          Plaintiffs,                    :

        v.                                      :        NO. 17-5416

AQUATHERM L.P., et al.,                  :

          Defendants.                    :
. .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .

GAIL SHIPMAN, et al.,                    :

          Plaintiffs,                    :

        v.                                      :

ARCO INDUSTRIAL SALES, INC.,             :
et al.,
          Defendants.                    :

## MEMORANDUM OPINION

## I.    INTRODUCTION

In this wrongful death and survival action, Plaintiffs Gail Shipman, individually and as

personal representative of the Estate of Roy Marvin Shipman, Jr., deceased, Roy Shipman III,

and Justin Shipman (collectively, "Plaintiffs"), bring claims against Defendants Aquatherm, L.P.

("Aquatherm"), N.H. Yates and Company, Inc. ("Yates"), Landstar Ranger, Inc. ("Landstar"),

ARCO Industrial Sales, Inc. d/b/d ARCO Packaging and Janitorial Sales ("Arco"), and Signode

Industrial Group LLC ("Signode"), arising from the July 15, 2016 death of Roy Marvin

Shipman, Jr. ("Shipman") at Yates' facility in Pottstown, Pennsylvania.[1]

Presently before the Court are the following motions, which are ripe for disposition: (1) Aquatherm's Motion for Partial Summary Judgment (Doc. No. 118); (2) Signode's Motion for Summary Judgment (Doc. No. 116); (3) Arco's Motion for Summary Judgment (Doc. No. 119); (4) Yates' Motion for Summary Judgment (Doc. No. 117); and (5) Landstar's Motion for Summary Judgment (Doc. No. 120). For the reasons set forth below, Aquatherm's Motion for Partial Summary Judgment and Landstar's Motion for Summary Judgment seeking to dismiss Plaintiffs' punitive damages claims will be granted. The remaining claims addressed in Landstar's Motion for Summary Judgment and the Motions for Summary Judgment of Signode, Arco, and Yates will be denied.

## II.    **BACKGROUND**

This wrongful death and survival action arises from the July 15, 2016 death of Shipman at Yates' facility in Pottstown, Pennsylvania. Plaintiffs allege that Shipman died when a load of

---

[1]    Plaintiffs commenced this action in this Court on December 4, 2017 against Defendants Aquatherm, Landstar, and Yates. Compl., Shipman v. Aquatherm, No. 17-5416 (E.D. Pa. Dec. 4, 2017) (Doc. No. 1). This case was originally assigned to the Honorable Chief Judge Juan R. Sánchez. On May 2, 2018, upon consent of the parties and by order of Chief Judge Sánchez, the case was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) to conduct all further proceedings in the case, including trial, the entry of final judgment, and all post-trial proceedings. Order, Shipman v. Aquatherm, No. 17-5416 (E.D. Pa. May 2, 2018) (Doc. No. 32). On July 12, 2018, Plaintiffs filed a separate action against Defendants Signode and Arco. Compl., Shipman v. Arco, No. 18-2922 (E.D. Pa. July 12, 2018) (Doc. No. 1). This case was also assigned to Chief Judge Sánchez, but referred to the undersigned on October 10, 2018, upon consent of the parties. Order, Shipman v. Arco, No. 18-2922 (E.D. Pa. Oct. 10, 2018) (Doc. No. 28). On October 17, 2018, the undersigned granted Plaintiffs' motion to consolidate Civil Action No. 18-2922 into the related Civil Action No. 17-5416. Order, Shipman v. Aquatherm, No. 17-5416 (E.D. Pa. Oct. 17, 2018) (Doc. No. 49); Order, Shipman v. Arco, No. 18-2922 (E.D. Pa. Oct. 17, 2018) (Doc. No. 31). The parties were directed that all further filings in these actions should be filed under Civil Action No. 17-5416. Accordingly, further references and citations to filings in this Memorandum Opinion shall be to the docket in Civil Action No. 17-5416 unless otherwise specified.

polypropylene pipes, which he had delivered from Aquatherm's Utah warehouse to Yates' facility, fell onto him from the flatbed trailer he was operating and had leased to Landstar.  First Am. Compl. (Doc. No. 15) ¶¶ 12-13, 17 [hereinafter "FAC"].

Shipman was a tractor-trailer driver with more than 20 years of experience, which included hauling loads of pipe with the tractor and flatbed trailer he owned.  See Landstar's Mot. for Summary J., Ex. D (Shipman's application for employment).  On or about March 26, 2015, Shipman entered into an Independent Contractor Operating Agreement with Landstar allowing him to accept loads for interstate carriage using his tractor and flatbed trailer operating under Landstar's USDOT authority as a registered motor carrier.  See id. Ex. E (Independent Contractor Operating Agreement).  Landstar is a freight-transportation, logistics company that hires independent contractors to haul loads for its shipping customers.  Dep. of C. Cleveland (attached as Ex. 13 to Pls.' Resp. in Opp. to Landstar's Mot. for Summary J. (Doc. No. 129)) at 19 [hereinafter "Cleveland Dep."]; Landstar's Mot. for Summary J., Ex. G (Aff. of C. Cleveland).  Neither Landstar, its parent company, nor its subsidiaries own any tractor-trailers. Cleveland Dep. at 17.  Instead, Landstar requires that its independent-contractor drivers lease their trucks to Landstar for its "exclusive possession, control, and use," and it "assume[s] complete responsibility for the operation of the [trucks]" during the term of the Landstar-driver agreements.  See Independent Contractor Operating Agreement.

Pursuant to the Independent Contractor Operating Agreement, the independent contractor is responsible for the loading and unloading of the shipments, but Landstar reserves the right to arrange for the loading and unloading of loads.  Id.  Transportation of Landstar's customers' loads is arranged with the independent-contractor drivers through freight agents, who are also independent contractors.  Cleveland Dep. at 19; Aff. of C. Cleveland.  Landstar operates a "load

board" over the internet that Landstar's freight agents populate with data regarding available loads procured by the freight agents from Landstar's shipping customers.  Aff. of C. Cleveland. Landstar's independent-contractor drivers could access the "load board" via the internet to review the data about available loads including origin, destination, mileage, nature and weight of the freight, shipping rates, and equipment requirements for each load, such as equipment length, flatbed trailer, refrigerated trailer, and oversize load.  Id.  Independent-contractor drivers, such as Shipman, were free to accept any load which met their needs and for which they operated the proper equipment.  Id.  Once an independent-contractor driver committed to accepting a particular load, the agent for that load would communicate with the driver regarding anticipated delivery dates and times, as well as any information specific to that load, including any special instructions for pickup and delivery of the load.  Id.

Aquatherm is a distributor of pipe valves and fittings in the United States.  Dep. of J. Hardy (attached as Ex. 16 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. (Doc. No. 127)) at 4 [hereinafter "Hardy Dep."].  Aquatherm and Yates had a Warehousing and Fulfillment Services Agreement pursuant to which Aquatherm would send pipes to Yates to warehouse and send to its customers on the eastern seaboard.  Dep. of M. Farley, Vol. I (attached as Ex. 1 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) at 13 [hereinafter "Farley Dep. I"]; Dep. of R. Fierro (attached as Ex. 4 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) at 28 [hereinafter "Fierro Dep."]; Dep. of J. Thomas (attached as Ex. 22 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) at 20, 23-24, 36 [hereinafter "Thomas Dep."]; Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J., Ex. 2 (Warehousing and Fulfillment Services Agreement).  Yates also served as a sales representative for Aquatherm beginning in 2009.  Thomas Dep. at 17-18.  When shipping a load, Aquatherm

would send Yates notice that a delivery was coming and would arrange for the shipping logistics. Id. at 27, 29-30; Dep. of C. Batzel (attached as Exhibit 17 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) at 45-46, 50 [hereinafter "Batzel Dep."].

Aquatherm contracted with Landstar for the transport of pipes from Aquatherm to Yates. Farley Dep. I at 71-72. The load required the use of a 48-foot flatbed trailer, such as Shipman's flatbed trailer, to haul the load. Landstar's Br. in Supp. of Mot. for Summary J. (Doc. No. 121) at 2 [hereinafter "Landstar Br."]. Shipman contacted Rachel Fierro ("Fierro"), a Landstar freight agent, regarding one of the available loads placed on Landstar's internet-based "load board" and reached an agreement to transport the load. Cleveland Dep. at 29-30, 33. Fierro subsequently generated a Landstar "load confirmation" confirming that the load was given to Shipman. Id. at 38; Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J., Ex. 14 (Uniform Straight Bill of Lading); Landstar's Mot. for Summary J., Ex. H (Load Confirmation). The load confirmation specified the commodity as one piece of "plastics/rubber articles" for pickup from Aquatherm in Utah on July 11, 2016, and delivery to Yates in Pennsylvania on July 14, 2016. Load Confirmation; Cleveland Dep. at 40-46. Shipman chose to accept a load of plastic pipe to be picked up at the shipper, Aquatherm, in Lindon, Utah, for delivery to Yates, in Pottstown, Pennsylvania. Load Confirmation. There were five loads of Aquatherm pipe that were transported to Yates over the course of two weeks in July, with Shipman's being the fourth load. Fierro Dep. at 28-29.

Signode is in the business of industrial packaging, "unitizing and loading methods for products [for] bulk shipment." Dep. of P. Sowa (attached as Ex. 3 to Pls.' Resp. in Opp. to Signode's Mot. for Summary J. (Doc. No. 125)) at 17-18. Signode manufactures "a polyester green material strap" specifically stamped with its own American Association of Railroads

("AAR") designation, AAR 11.  Id. at 20-21.  Signode manufactures these straps for use in the shipment of PVC pipe on flatbed trailers.  Id. at 31-32.

Arco is an industrial sales company that sells packaging, janitorial equipment, and products.  Dep. of J. Mitchell Vol. I (attached as Ex. 17 to Pls.' Resp. in Opp. to Arco's Mot. for Summary J. (Doc. No. 128)) at 9 [hereinafter "Mitchell Dep. I"].  Arco has been selling Signode products for at least 30 years.  Id. at 12, 14.  The bands used to unitize and package the pipes on Shipman's flatbed trailer were supplied to Aquatherm by Arco.  See Hardy Dep. at 13; Farley Dep. I at 53; Dep. of M. Farley Vol. II (attached as Ex. 10 to Pls.' Resp. in Opp. to Arco's Mot. for Summary J.) at 15-16 [hereinafter "Farley Dep. II"].  Aquatherm relied on Arco's recommendations with respect to what bands to use to bundle the pipes.  Farley Dep. I at 53-54; Hardy Dep. at 15-16, 24-25.  Arco sales representatives would travel to Aquatherm to observe how it was banding its pipes and they would demonstrate the bands and the banding machine used to meld the bands together to Aquatherm.  Farley Dep. I at 53-54; Farley Dep. II at 31-33, 49-50.  Arco passed along to its customers, including Aquatherm, information it received from the manufacturer, like Signode, such as catalogs and brochures.  Mitchell Dep. I at 19-20.

Aquatherm would receive its inventory of pipes from Germany.  Farley Dep. I at 35-36. The pipes would arrive in the United States via container ship and would be taken by rail to the interior of the country, where they would then be delivered to Aquatherm's facility in Utah via semi-truck.  Id.  The loose pipes would then be assembled into bundles and stored in the warehouse until a delivery was scheduled.  Id. at 39-44.  Each bundle would be unitized with side boards (also called dado board or dunnage) for structure and five green bands.  Id. at 48. Michael Farley ("Farley"), Aquatherm's warehouse manager, had overseen this process since 2012.  Id. at 40-41.  Farley also oversaw the process of loading bundles of pipe onto trucks for

shipment.  Id. at 29.  Once a customer placed an order for pipes, a pick ticket would be created.
Id. at 16-17.  Thereafter, the order would be staged in the warehouse to be loaded later onto
trucks.  Id. at 23-25.  Farley would then be responsible for overseeing the actual process of
loading the individual bundles of pipe onto trucks for shipment.  Id. at 64.

With respect to the load of pipes transported by Shipman, Farley testified that he recalled
personally loading the pipes onto Shipman's flatbed trailer.  Id. at 8-21, 65-66.  Farley indicated
that he did not stack any more than two full-height bunks of pipe onto Shipman's flatbed, as he
was concerned with the stacks falling off if they were too high.  Id. at 112-14.  Farley testified
that he wanted the pipe products to stay on the truck when the driver removed the straps.  Id. at
116.  He further testified that he placed all of the pipes on Shipman's flatbed trailer with a
forklift, and then used the forklift again, after the truck was at least partially loaded, to lift the
load in order to allow extra dado boards to be placed under the load, pursuant to Shipman's
request.  Id. at 87-88, 100-02.  Farley inspected Shipman's load before it left the warehouse to
ensure that it appeared safe.  Id. at 64-65.  Plaintiffs aver that "Aquatherm . . . did not find
anything unsafe about Roy's request for the extra dado board and assumed it was a leveling issue
with his truck."  Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 15 (citing
Farley Dep. I at 66-67).  Farley believed that the bands used to bundle the pipes would be
sufficient so as to prevent movement of the pipes within the bundle, even when the bundles were
stacked.  Farley Dep. I at 121.  After Shipman's flatbed trailer was loaded at the Aquatherm
facility, Shipman secured the bundles of plastic pipe to the flatbed trailer with securement straps
he owned.  Landstar's Br. at 3.  Farley inspected the load during the loading process and would
not have placed a load on a trailer if he did not believe it was safe.  Farley Dep. I at 64-65, 132.
Although Farley advised that he had witnessed green bands breaking, he testified that, "[as] far

as it just snapping on its own, I've never seen it just break randomly." Id. at 60-61.  Instead, he

saw green bands that had broken during the machine-banding process if the bands were released

too soon, or if someone hit the bands with a forklift.  Id.

Prior to Shipman's arrival at Yates' facility in Pottstown, Pennsylvania, Landstar

contacted Chris Batzel ("Batzel"), Yates' warehouse supervisor, regarding whether Shipman

could arrive for unloading a day earlier than planned, on July 14, 2016.  Batzel Dep. at 55-56.

Batzel testified that he informed Landstar that Yates' personnel could not accommodate

Shipman's request.  Id.  However, it was acceptable to Yates for Shipman to remain on its

premises overnight if he arrived during the evening prior to the delivery date, in which case he

could stay in his tractor-trailer in the parking area outside Yates' warehousing yard, but the fence

enclosing the warehouse and dock area would be locked until Yates' personnel arrived the next

morning.  Id.  Batzel testified that he informed Landstar that the driver "can wait outside the

parking lot, but tell him not to unstrap his load before somebody gets in the next morning on

Friday."  Id.  However, Fierro, the independent freight sales agent who coordinated the load on

behalf of Landstar, testified that she did not have a conversation regarding this topic with anyone

at Yates.  Fierro Dep. at 31.

Yates was closed when Shipman arrived.  While the sequence of events leading up to the

accident are largely unknown as there were no eyewitnesses to the accident, the record reflects

that Shipman began unstrapping his load sometime in the middle of the night after his arrival at

the Yates facility.  The first Yates employee to arrive the morning of July 15, 2016, was Batzel,

who arrived at approximately 7:00 a.m.  Batzel Dep. at 8.  Batzel testified that when he pulled

into the parking lot of Yates' facility, he noticed that the pipes were on the ground.  Id. at 8-10.

At that time, he thought the pipes had just fallen off the truck because the truck was running and

8

he assumed the driver was still in the cab.  Id.  At approximately 7:40-7:45 a.m. that morning,

Yates employee Jason Steinmetz arrived for work and found Shipman's body underneath the

pipes.  Aquatherm's Mot. for Partial Summary J., Ex. P (Incident Report).  Although no one

witnessed the incident, the police report indicated that Shipman began to unfasten the yellow

straps that had secured the pipes on his trailer.  Id.  It was believed that when Shipman removed

the yellow securement straps from the load, the right rear-top bundle fell onto him.  Id.

First responders arrived at the accident scene shortly thereafter.  The Occupational Safety

and Health Administration ("OSHA") was also called to the scene, but OSHA determined that it

did not have jurisdiction and ceased its investigation that day.  Signode's Mot. for Summary

Judgment at 6.  However, OSHA took a number of photographs of the accident scene, photos of

which have been included by the parties in their motions.  Id.  According to OSHA's Fatality

Catastrophe Report, "[w]hile un-securing the strapping, the banding holding the pipe together

snapped resulting in the top bundle to fall on top of the driver.  The preliminary cause of

[Shipman's] death is crushing injury."  Pls.' Resp. in Opp. to Signode's Mot. for Summary J.,

Ex. 8 (OSHA Report).  In his report, Sgt. Marchese of the Limerick Township Police

Department noted the following:

> SHIPMAN appeared to have removed the straps securing the load.  The load shifted
> and fell onto SHIPMAN.  The large straps that hold down the load to the trailer had
> been removed.  There were no stakes in the flatbed[-]trailer pockets.  There were
> no restraints to keep the load from moving when I arrived.  There were 8 bundles
> of pipes.  The front of the trailer had 4 bundles, 2 wide and 2 high.  Behind the 4
> bundles was another stack of 4 bundles, 2 wide and 2 high.  The top right side
> bundles is the one that fell on SHIPMAN.

Pls.' Resp. in Opp. to Arco's Mot. for Summary J., Ex. 9 (Supplemental Narrative of Sgt.

Marchese).  Neither the green bands used to unitize the bundles of pipe on Shipman's flatbed

trailer, including the bands that broke, nor the yellow securement straps that secured the entire

load of pipe on Shipman's trailer, were preserved after the accident.  Signode's Mot. for

Summary J., Ex. I (Pls.' Objections and Answers to Signode's Interrogatories).  Similarly,

neither the dunnage used in the package process, Shipman's flatbed trailer, nor Shipman's tractor

were preserved after the accident.  See Dep. of G. Shipman (attached as Ex. H to Signode's Mot.

for Summary J.) at 116-17.  No party is in possession of the green bands, nor has any party had

the opportunity to examine, inspect, test or photograph the subject bands.

## III.   LEGAL STANDARD

Under the well-established summary judgment standard, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment

is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law.'"  Williams v. Wells Fargo

Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v.

Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's case,
> and on which that party will bear the burden of proof at trial. In such a situation, there can
> be "no genuine issue as to any material fact," since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders all
> other facts immaterial. The moving party is "entitled to judgment as a matter of law"
> because the nonmoving party has failed to make a sufficient showing on an essential
> element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact]

provides that the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-

48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).  To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'"  Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Aquatherm's Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim Will Be Granted

Plaintiffs seek punitive damages against Aquatherm for negligence in Counts I, IV, V, and VI of their First Amended Complaint.  See FAC Counts I, IV, V, and VI.  Plaintiffs contend that Aquatherm distributed the pipes and was responsible for the preparation, unitization, packaging, and securement of the pipes onto Shipman's trailer.  Id. ¶ 24.  Plaintiffs maintain that Aquatherm failed to properly arrange, secure, inspect and/or ship the pipes on Shipman's trailer, and that Aquatherm was negligent when it utilized green polyester "Tenax" bands to bundle the pipes.  Id. ¶ 25.  According to Plaintiffs, these bands "snapped" causing the load to shift and the top bundle of pipe to fall onto Shipman.  Id. ¶ 17.  Plaintiffs further allege that Aquatherm did not install the proper bands, dunnage or other proper and necessary means of securement, and failed to properly arrange, secure, package, load, unitize, inspect, and/or ship the pipe to prevent shifting during unload, and that Aquatherm's actions were willful, wanton, reckless, and/or

grossly negligent.  Id. ¶¶ 18-19, 23-25 (a-l), 39.  Aquatherm moves for partial summary as to Plaintiffs' punitive damages claim.  Aquatherm's Mot. for Partial Summary J. at 1.  As set forth below, Plaintiffs' punitive damages claim against Aquatherm will be dismissed.

This Court may determine punitive damages claims on summary judgment.  See Vitalis v. Sun Constructors, Inc., 481 F. App'x 718, 729 (3d Cir. 2012) (citing Pichler v. UNITE, 542 F.3d 380, 387 (3d Cir. 2008), Cochetti v. Desmond, 572 F.2d 102, 103 (3d Cir. 1978)).  State law governs the legal standard for punitive damages.  Wright v. Ryobi Techs., Inc., 175 F. Supp. 3d 439, 455 (E.D. Pa. 2016).  Accordingly, Pennsylvania substantive law regarding punitive damages applies to Plaintiffs' claim against Aquatherm.  Id. at 455-56.

In Pennsylvania, the Restatement (Second) of Torts § 908 governs the imposition of punitive damages, id., which are "awarded against a person to punish him [or her] for his [or her] outrageous conduct and to deter him [or her] and others like him [or her] from similar conduct in the future."  Restatement (Second) of Torts § 908(1).  Under Pennsylvania law, punitive damages are an "'extreme remedy' available in only the most exceptional matters."  Phillips v. Cricket Lighters, 883 A.2d 439, 445 (Pa. 2005) (citing Martin v. Johns-Manville Corp., 494 A.2d 1088, 1098 n.14 (Pa. 1985), rev'd on other grounds sub nom., Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800 (Pa. 1989)).  "Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either 'the defendant's evil motive or his [or her] reckless indifference to the rights of others.'"  Id. (citing Martin, 494 A.2d at 1096).  "A defendant acts recklessly when 'his [or her] conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his [or her] conduct negligent."  Id. (citing Hutchison v. Luddy, 870 A.2d 766, 771 (Pa. 2005)).  Punitive damages are not awarded for mere inadvertence, mistake, or

errors of judgment constituting ordinary negligence.  Wright, 175 F. Supp. 3d at 456.  "Thus, a

showing of mere negligence, or even gross negligence, will not suffice to establish that punitive

damages should be imposed."  Phillips, 883 A.2d at 445 (citing SHV Coal, Inc. v. Cont'l Grain

Co., 587 A.2d 702, 705 (Pa. 1991).  "Rather, the plaintiff must adduce evidence which goes

beyond a showing of negligence, evidence sufficient to establish that the defendant's acts

amounted to 'intentional, willful, wanton or reckless conduct . . . .'"  Id. at 446 (citing SHV Coal,

Inc., 587 A.2d at 704).  "Punitive damages . . . are not awarded to compensate the plaintiff for

[his or] her damages but rather to heap an additional punishment on a defendant who is found to

have acted in a fashion which is particularly egregious."  Phillips, 883 A.2d at 446.  "[O]ne must

look to 'the act itself together with all the circumstances including the motive of the wrongdoers

and the relations between the parties.'"  Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984) (quoting

Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963)).  "The state of mind of the actor is

vital.  The act, or the failure to act, must be intentional, reckless or malicious."  Id.

Furthermore, a punitive damages claim must be supported by evidence sufficient to

establish that "'(1) a defendant had a subjective appreciation of the risk of harm to which the

plaintiff was exposed and that (2) he [or she] acted, or failed to act, as the case may be, in

conscious disregard of that risk."  Bailey v. B.S. Quarries, Inc., No. 3:13cv3006, 2016 WL

1271381, at *13 (M.D. Pa. Mar. 31, 2016) (quoting Hutchison, 870 A.2d at 772).  "'That

"conscious disregard" is critical: an appreciation of the risk is a necessary element of the mental

state required for the imposition of [punitive] damages.'"  Id. (quoting Brand Mktg. Grp. LLC v.

Intertek Testing Servs., N.A., Inc., 801 F.3d 347, 360 (3d Cir. 2015)).  Here, Plaintiffs have

failed to adduce sufficient evidence to show that Aquatherm acted with wanton or outrageous

conduct, or was otherwise recklessly indifferent, when it packaged, unitized, and loaded the pipes onto Shipman's flatbed trailer.

Plaintiffs argue that Aquatherm was aware that its bundles of pipe and the bands it was utilizing to bundle the pipes were extremely dangerous and prone to break.  Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 36-37.  In support of this contention, Plaintiffs rely on the testimony of Batzel, Yates' warehouse manager.  According to Batzel's testimony, on the morning Shipman was found under the pipes, Yates' employees questioned Giovanni Iannuzzi ("Iannuzzi"), Aquatherm's salesman that had an office at Yates' facility, whether "anything happened like this before."  Batzel Dep. at 33.  Batzel stated that Iannuzzi "said he heard of 'people losing limbs from unloading pipe, but never death.'"  Id. at 34.  Plaintiffs argue that this testimony supports their contention that Aquatherm was "aware of the extreme degree of risks in connection with its loads and the bands."  Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 22.  Batzel's testimony, however, is simply too vague to support an inference that Aquatherm was aware that the green bands securing the bundles of pipe were prone to breaking and could lead to injury.  It is entirely unclear from this testimony what "people" Iannuzzi was referring to, when these unidentified instances that he "heard of" might have occurred, where they occurred, with what kind of pipe, under what circumstances the unloading may have led to any injury, and the cause of any such injuries.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2011); see also Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999) (rejecting "ambiguous allegations and vague inferences that cannot defeat summary judgment"); cf. Smith v. Twp. of E. Greenwich, 344 F. App'x 740, 747 (3d Cir. 2009) ("[Plaintiff's] general assertion . . . . without

any specifics as to the who, what, or when of such allegations" was insufficient to defeat summary judgment). Here, Iannuzzi's response, as related by Batzel, is entirely too vague to support a punitive damages claim against Aquatherm.

Plaintiffs also rely on Batzel's testimony regarding alleged problems with "the first of the five July 2016 loads delivered from Aquatherm." Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 18. Batzel testified that the first of the five loads Yates was expecting to receive from Aquatherm arrived on Monday, July 11, 2016. Batzel Dep. at 56-57. Batzel described how it was his first time ever unloading a "flatbed pipe before, [and] [he] thought [he] could do it . . . by [him]self." Id. at 57. However, when unloading the first load with a forklift by himself, he missed the opening on the pipe and "[t]he pipe on the right side came crashing to the ground." Id. at 62. Furthermore, the load that arrived on July 11, 2016 was stacked "three high" which Batzel surmised was "not as safe as it could be." Id. Plaintiffs' reliance on Batzel's experience unloading the first of the five loads that were delivered to Yates as evidence that Aquatherm had knowledge that its green bands were prone to breaking, simply does not support a punitive damages claim against Aquatherm. Batzel's testimony regarding the difficulty unloading the first of the five loads of pipe from Aquatherm was unrelated to any issues regarding the bundling of the pipes with the green bands. Moreover, to the extent Batzel's testimony concerned the risk of stacking loads "three high" on the flatbed, it is undisputed that Shipman's load was only stacked two bundles high. See Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary Judgment, Ex. 11 (Photo depicting the scene of the accident); Farley Dep. I at 111-12. Consequently, Plaintiffs' reliance on Batzel's testimony regarding the alleged difficulties presented by unloading the shipment of pipe Yates received from Aquatherm does

not demonstrate a level of awareness regarding the green bands' propensity to break sufficient to

support a punitive damages claim against Aquatherm.

In addition to relying on Batzel's testimony, Plaintiffs also argue that the testimony of

Yates employee Logan Moran ("Moran") creates a genuine issue of material fact that Aquatherm

was aware that the green bands it used to bundle its pipes would break during transit.  Pls.' Resp.

in Opp. to Aquatherm's Mot. for Partial Summary J. at 19-22.  Plaintiffs contend that Moran's

testimony indicates that both he and Batzel had conversations directly with Aquatherm regarding

the green bands' tendency to break.  Id. at 19-21.  To the extent Plaintiffs rely on Moran's

testimony to establish that Yates informed Aquatherm of problems with the bands breaking, the

testimony contains speculative statements about what was conveyed to Aquatherm.  Contrary to

Plaintiffs' assertion, Moran did not testify that "Aquatherm [was] told that the bands were

breaking while in transport and/or unloading."  Id. at 20 (citing Dep. of L. Moran (attached as

Ex. 18 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) [hereinafter "Moran

Dep."] at 22).  Instead, Moran testified that he specifically heard Batzel calling Landstar.  Moran

Dep. at 22.  Plaintiffs also cite to the following testimony from Moran:

> Q.  When is the first time you think these conversations were had about these
> bands breaking in relationship to that accident?
>
> …
>
> A.  I want to say after the first shipment was received here . . . I'm talking about
> the first actual Aquatherm shipment . . . we received.  Not . . . with this incident.
>
> Q.  A year or more before this accident?
>
> A.  Yes.
>
> Q.  You think that Aquatherm conversations happened over a year before the
> accident?
>
> A.  Yes.

Q.  And you think that Yates, as a matter of routine practice, started advising the **carriers** to tell their driver of this problem?

A. Yes.

Q.  Immediately?

A.  Immediately.

. . .

A.  That's what I think happened.

. . .

A.  I am guaranteeing it happened with this incident . . . [b]ecause I was there when Chris [Batzel] had mentioned that he had talked to them about it, and I was there in the office when he had called them.

Q.  Do you remember what day he called Landstar?

A.  That I couldn't tell you.

Id. at 23-25 (emphasis added).  Moran's testimony clearly relates to a conversation between Batzel and Landstar, the carrier, that occurred regarding the unloading of pipes received from Aquatherm, not a conversation between Batzel and Aquatherm itself.  Plaintiffs further rely on additional testimony from Moran that he was aware and had seen the green bands used by Aquatherm break routinely for a number of years and that Aquatherm was informed of this.  Id. at 10-11, 13, 17-18, 20-22.  Moran could not state with certainty, however, that Aquatherm was made aware of the alleged prior breakage of the bands, and never had any communications with Aquatherm himself.  Id. at 60-61.  In contrast, Farley testified that, "[as far as it just snapping on its own, I've never seen it just break randomly" and was not aware of problems occurring with the green bands in transit.  Farley Dep. I at 60-61, 135; see also Hardy Dep. at 12-13, 23; Holmes Dep. at 22-23.  Nevertheless, even if Batzel and Moran communicated instances of the green bands breaking, "'[a] defendant's mere knowledge of other accidents involving a product is insufficient to support a claim for punitive damages.'"  Dyvex Indus., Inc. v. Agilex Flavors &

Fragrances, Inc., No. 12-CV-0979, 2018 WL 827518, at *4 (M.D. Pa. Feb. 12, 2018) (quoting

Hoffman v. Paper Converting Mach. Co., 694 F. Supp. 2d 359, 374 (E.D. Pa. Mar. 3, 2010)).

Consequently, Plaintiffs' reliance on Moran's testimony is insufficient to create a genuine issue

of material fact as to whether Aquatherm was aware the green bands, like the ones used on

Shipman's load, would spontaneously break during transit.

      Plaintiffs further maintain that Aquatherm failed to design, or redesign, their bundles of

pipe for shipping based on any engineering principles, industry standards, or safety factors and

that it failed to train its employees on how to properly unitize and load the pipes or implement

written policies and procedures for unitizing or loading the pipes.  Pls.' Resp. in Opp. to

Aquatherm's Mot. for Partial Summary J. at 24-30.  Arco supplied Aquatherm with the bands

used to bundle the pipes and made recommendations as to what types of bands to use on

Aquatherm's pipes.  Farley Dep. I at 53-54; see also Hardy Dep. at 24-25.  Although Farley only

received on-the-job training to learn how to unitize the pipes and never received any classes or

written training materials from Aquatherm, see Farley Dep. I at 41-42, 52, he testified that he

believed that the bands used to bundle the pipes would be sufficient so as to prevent movement

of the pipes within the bundle, even when the bundles were stacked, id. at 121.  Farley stated that

he inspected the load during the loading process and would not place a load on a trailer if he did

not believe it was safe.  Id. at 64-65, 132.  Although Plaintiffs identify the various ways in which

Farley's training, as the warehouse manager, may have been deficient with respect to the

bundling of the pipes, see Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 26,

it is nevertheless undisputed that Shipman's load was stable and secure after Farley loaded the

pipes and Shipman left Aquatherm's Utah facility, as Farley had intended.  Indeed, relying on the

testimony of their expert, Dr. Singh, Plaintiffs explain that, "[o]nce the load is placed on the

trailer and stable, the driver secures the load to the truck with the outer yellow securement straps. If the load was not stable at the time of loading, [Shipman] could not have secured the load with the outer securement straps and it would have come apart." Id. at 10 (citing Dep. of P. Singh (attached as Ex. 2 to Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J.) at 48-49 [hereinafter "Singh Dep."]).  Plaintiffs themselves acknowledge that "Aquatherm even admits that when the driver removes the outer straps, it does not want the bundles to fall of[f] the truck." Id. at 45 (citing Farley Dep. I at 116).  Despite Farley's alleged lack of formal training, Plaintiffs concede that "Farley nevertheless believed the bands should have been sufficient to prevent the movement of the pipe within the bundles." Id. at 26 (citing Farley Dep. I at 121).  Although Plaintiffs rely on the opinion of Dr. Singh that Aquatherm failed to use plastic bands that were of the appropriate strength and quantity, see Pls.' Resp. in Opp. to Aquatherm's Mot. for Partial Summary J. at 28, their expert's testimony that the strength and quantity of the banding system was "inappropriate," Singh Dep. at 101-02, is not evidence that Aquatherm acted with the degree of culpability required for the imposition of punitive damages.  See Wright, 175 F. Supp. 3d at 456-57 (Plaintiff's references to his expert's testimony that an alternative product "has an allegedly safer design than [the product at issue] is not evidence that defendants acted with the degree of culpability required for punitive damages.").

"Punitive damages are not justified when the defendant's mental state rises to no more than gross negligence, and there is only a jury question on this issue if the defendant's conduct was reckless because it knew, or had reason to know, of facts creating a high degree of risk of physical harm to another and then deliberately acted or failed to act in conscious disregard of, or with deliberate indifference to, that risk." Id. at 457.  While a jury might find that Aquatherm failed to reasonably perform the duty it undertook in bundling and loading the pipes on

Shipman's truck, the evidence presented is insufficient to support a finding that it acted with the state of mind necessary to impose punitive damages.  Feld, 485 A.2d at 748.  Thus, Plaintiffs have failed to adduce evidence sufficient to show that Aquatherm's alleged conduct was "intentional, willful, wanton or reckless."  Phillips, 883 A.2d at 446.  Plaintiffs' evidence "simply does not show a culpable state of mind on the part of [Aquatherm] as required to obtain the extreme remedy of punitive damages, which are penal in nature and only proper if [Aquatherm's] conduct was so outrageous as to show willful, wanton, or reckless conduct." Dyvex, 2018 WL 827518, at *5; see also Vitalis, 481 F. App'x at 729.

   **B.     Signode's Motion for Summary Judgment Will Be Denied**

   In their Amended Complaint against Signode, Plaintiffs bring claims for negligence and strict liability, alleging that Signode manufactured the green bands that were used to unitize the bundles of pipe that were ultimately loaded onto Shipman's flatbed trailer, as well as the machine used to seal the bands together.  FAC ¶ 5 (No. 18-2922).  Plaintiffs contend that "Signode sold the green bands and machine to Arco who then recommended and distributed them to Aquatherm for use in unitizing, packaging and/or securing pipe for transport.  Given that several of the Tenax straps broke, Plaintiffs claim the bands and the machine utilized to seal the bands were defectively designed, manufactured and/or distributed."  Id. ¶ 22.  Signode moves for summary judgment on Plaintiffs' claims arguing that Plaintiffs have failed to prove that Signode manufactured the product.  As set forth below, Signode's Motion for Summary Judgment will be denied.

   On June 14, 2018, prior to Signode's involvement in the litigation, Aquatherm responded as follow to Interrogatory No. 9 of Plaintiffs' First Set of Interrogatories:

**INTERROGATORY NO. 9:**

Were any individuals or companies other than those named in the Complaint herein involved in any manner in the Incident made the basis of this suit?  If your answer is in the affirmative, please identify said individuals and/or companies.

**ANSWER: Objection.  Interrogatory is vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving the foregoing objections, the Tenax strapping used to bundle the pipes at[]issue were manufactured by Signode Packaging Systems and distributed by ARCO Packaging.  Answering Defendant reserves the right to supplement this answer up to, and including at, the time of trial.**

Signode's Mot. for Summary J., Ex. B (Aquatherm's Answers to Plaintiffs' First Set of Interrogatories) (bold in original) [hereinafter "Aquatherm's Rog. Answers"].  Plaintiffs subsequently filed a separate action against Signode and Arco, which was consolidated with the initial case.  Signode argues that "[t]he entire basis upon which Signode was brought into this litigation – Aquatherm's Answer to Interrogatory Number 9 – has been undermined" and, therefore, it is entitled to summary judgment on all of Plaintiffs' claims.  Signode's Mem. of Law in Supp. of Mot. for Summary J. at 25 [hereinafter "Signode Br."].

Signode admits that it manufactured some of the green bands found on Shipman's flatbed trailer.  Id. at 13.  After Shipman's body was discovered, first responders arrived and OSHA was also called to the scene to investigate the accident.  Id. at 6.  Photographs taken at the scene show Signode's code, AAR-11, stamped on arguably two unbroken bands.  Signode's Mot. for Summary J., Ex. L (OSHA Photograph).  No code, however, can be seen in the photographs of the two broken bands.  Id., Ex. G (OSHA Photograph).  Moreover, Signode argues that the photographs of Shipman's flatbed trailer that were taken by OSHA investigators after the accident actually show at least two different types of green bands that were used to package Shipman's load – bands that are two different shades of green.  Id., Ex. L.  When confronted with this photograph, Aquatherm warehouse manager Farley conceded that two different colors of bands were present on Shipman's flatbed trailer, but he could not provide information about

the manufacturer of those bands, or whether they were products from two different manufacturers. Farley Dep. II at 21-22.

In further support of its argument that Plaintiffs cannot confirm that Signode manufactured the bands that broke, Signode points to the sales transaction history between itself and Arco, the sole supplier of green bands to Aquatherm. See, e.g., Signode Br. at 26. Specifically, Signode relies on the deposition of John Mitchell ("Mitchell"), the corporate designee for Arco, who testified that, on one occasion, namely September 23, 2015, Arco received strapping product from Continental Western Corporation, another manufacturer of green bands. Id. at 17; Dep. of J. Mitchell, Vol. II (attached as Ex. 20 to Pls.' Resp. to Signode's Mot. for Summary J.) at 18 [hereinafter "Mitchell Dep. II"]; see also Pls.' Resp. to Signode's Mot. for Summary J., Ex. 23 (Arco Purchase and Sales Records). The following day, on September 24, 2015, Mitchell testified that three rolls of strapping left Arco's inventory and were sold and sent to Aquatherm. Mitchell Dep. II at 18-19; Pls.' Resp. to Signode's Mot. for Summary J., Ex. 21 (Arco and Aquatherm Invoices from 2015 and 2016). Mitchell testified that Arco was unable to identify whether those three rolls of strapping sent to Aquatherm on September 24, 2015, or subsequent purchases made by Aquatherm in February and May 2016, were manufactured by Continental Western or Signode. Mitchell Dep. II at 18-19, 128-29. Mitchell confirmed, however, that the only time Arco received product from Continental Western, as opposed to Signode, was in September 2015. Id. at 55-56. Additionally, Signode relies on Farley's testimony that the bundles of pipe loaded onto Shipman's flatbed trailer could have been unitized with green bands from "years" ago because the pipes originally came to Aquatherm from Germany, where they were unitized upon arrival at Aquatherm's warehouse, and could have been in Aquatherm's warehouse for days to "years." Farley Dep. II at 69-70.

Based upon this information, Signode contends that Plaintiffs' purported identification of it as the manufacturer of the green bands at issue is entirely too speculative, relying on Martinez v. Skirmish, U.S.A., Inc., No. 07-5003, 2009 WL 1437624 (E.D. Pa. May 21, 2009), in support of that position.  In Martinez, plaintiff brought claims for negligence and strict liability against, among others, Skirmish, U.S.A. ("Skirmish"), alleging injuries resulting from being struck in the eye by a paintball at Skirmish's facility.  Id. at *1.  Skirmish, in turn, filed third-party complaints for contribution and indemnity against other entities, including Tippmann Sports, LLC ("Tippmann"), a manufacturer of paintball guns.  Id.  Tippman sought summary judgment on the ground that plaintiff could not identify any of its products as the cause of plaintiff's injury.  Id. at *2.  The court entered summary judgment in Tippmann's favor, concluding that "there is no evidence that Tippman was the manufacturer, designer, seller or distributor of the paintball gun used to shoot Martinez."  Id. at *4.  The court found that although "the majority of the paintball guns in use on the field where Martinez was injured were manufactured by Tippman . . . there is no evidence identifying the particular paintball gun used to shoot Martinez as having been manufactured by Tippman.  Evidence that a substantial percentage of the paintball guns that could have been used to injure Martinez were manufactured by Tippman is not sufficient to create a jury issue regarding the identity or manufacturer of the specific paintball gun used to shoot Martinez."  Id.

Signode also relies on Meadows v. Anchor Longwall & Rebuild, Inc., 455 F. Supp. 2d 391 (W.D. Pa. 2006) in support of its position.  In Meadows, the plaintiff was injured while pressuring a mine shield at work and the defendant filed a third-party complaint against the purported supplier and manufacturer of the fitting located in the shut-off valve that allegedly malfunctioned.  Id. at 392-93.  The third-party defendant moved for summary judgment, arguing

23

that a break in the chain of custody related to preserving the fitting casted doubt as to the authenticity of the product.  Id. at 394.  The court noted that the mine had ordered similar fittings from other suppliers, and that there was no way to differentiate the fittings supplied by the third-party defendant as compared to another supplier.  Id. at 398.  Accordingly, the court held that "[u]nder these circumstances, it appears that [the supplier's] liability in this matter cannot be established."  Id.

Here, in contrast, Plaintiffs do provide evidence that Signode may have been the manufacturer of the green bands that broke on Shipman's flatbed trailer, despite the fact that the green bands from the accident were not preserved.  As discussed supra, Aquatherm responded to Plaintiffs' Interrogatories by averring that "the Tenax strapping used to bundle the pipes at[]issue w[as] manufactured by Signode Packaging Systems and distributed by ARCO Packaging." Aquatherm's Rog. Answers, No. 9.  Aquatherm has not changed its sworn interrogatory response identifying Signode as the manufacture of the banding product it used to unitize the pipes.  Thus, the identity of the manufacturer of the green bands remains a contested factual issue.  Signode has not met its burden of demonstrating that there are no genuine issues of material fact regarding whether or not it manufactured the bands in question.  At trial, Signode will have the opportunity to offer a defense which seeks to undermine the Plaintiffs' contention that it manufactured the green bands at issue.  This evidence may be presented to a jury, which may accept or reject it.  Plaintiffs cannot be deprived of the opportunity to present their case to a jury under these circumstances.  Cf. O'Donnell v. Big Yank, Inc., 696 A.2d 846, 850 (Pa. Super. Ct. 1997) ("Because there was evidence offered identifying Appellees as the manufacturer and seller of the pants, it was inappropriate for the court to enter summary judgment.").

Signode also maintains that, because the green bands were not preserved in this litigation and, therefore, were never available to the parties for inspection, summary judgment is warranted. Signode's Br. at 26-31. In support of this contention, Signode relies on DeWeese v. Anchor Hocking Consumer Prods. Grp., 628 A.2d 421 (Pa. Super. Ct. 1993) and Roselli v. Gen. Elec. Co., 599 A.2d 685 (Pa. Super. Ct. 1991) for the proposition that, "in a products liability action, where a plaintiff brings an action claiming that he or she suffered an injury as a result of a defective product, the unavailability of the product at issue may warrant an entry of summary judgment." Signode's Br. at 26. Such is not the case here.

In DeWeese, the plaintiff brought suit against the manufacturer and seller of a glass pitcher after the pitcher exploded and injured him. 628 A.2d at 422. The plaintiff failed to preserve the pitcher's glass fragments. Id. at 423. The Pennsylvania Superior Court affirmed the granting of summary judgment in favor of the defendants, concluding that the plaintiff's "failure to preserve the shattered pitcher . . . precluded him from raising a genuine issue of material fact regarding the identity of its manufacturer and seller." Id. at 424. In so ruling, the Superior Court relied on Roselli, wherein it previously "granted summary judgment in favor of a manufacturer of a coffee maker after plaintiff discarded the coffee pot which shattered in her hand." Id. at 423 (citing Roselli, 599 A.2d at 687-88).

As explained in Meadows, however, "Roselli does not stand for the broad proposition that whenever a key piece of evidence is lost or destroyed summary judgment is warranted." 455 F. Supp. 2d at 394 (collecting cases). Pennsylvania courts have recognized that "'in cases in which the allegedly defective product is not available, a plaintiff may prove identification through circumstantial evidence.'" Warnick v. NMC-Wollard, Inc., 512 F. Supp. 2d 318, 331 (W.D. Pa. 2007) (quoting Payton v. Pa. Sling Co., 710 A.2d 1221, 1224 (Pa. Super. Ct. 1998)).

Roselli "concern[ed] the spoliation of evidence which, under the substantive law of Pennsylvania and federal law of evidence, permits a court to sanction a party that destroys evidence knowing that it is relevant to the litigation." Meadows, 455 F. Supp. 2d at 395. "[T]he failure to produce the product and, thus, offer direct evidence of the manufacturer's identity, [however,] does not automatically bar a plaintiff's recovery. The determination of whether a plaintiff has produced sufficient circumstantial identification evidence is factual and, thus, case-specific." Payton, 710 A.2d at 1224.

In the present case, Plaintiffs have submitted sufficient evidence to survive summary judgment. In DeWeese, the court reasoned that "[t]here [was] no testimony or reliable document . . . which tend[ed] to establish that DeWeese was injured by one of those pitchers [manufactured and sold by defendants]." DeWeese, 628 A.2d at 424. Here, in contrast, Plaintiffs have sworn testimony from Aquatherm that the green bands were manufactured by Signode. Like other cases that have distinguished DeWeese, Plaintiffs have "offered evidence tending to show that a *particular* defendant made or sold the product." Warnick, 512 F. Supp. 2d at 331-32 (emphasis in original). Therefore, the fact that the green bands were not preserved after the accident does not defeat Plaintiffs' claims against Signode on summary judgment.

Next, Signode argues that it is entitled to summary judgment because Plaintiffs cannot negate reasonable secondary causes for the bands breaking. Signode's Br. at 28-31. To recover under Pennsylvania law on a strict products liability claim, a plaintiff must generally prove that: (1) the product was defective; (2) the defect was the proximate cause of the plaintiff's injuries; and (3) the defect existed at the time it left the manufacturer's control. Barnish v. KWI Bldg. Co., 980 A.2d 535, 541 (Pa. 2009). "There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn

defect." Phillips v. A-Best Products Co., 665 A.2d 1167, 1170 (Pa. 1995). "In those cases where the plaintiff is unable to produce direct evidence of a product's defective condition and thus the precise nature of the product's defect, the plaintiff may, in appropriate cases, rely on the 'malfunction theory' of product liability." Walters v. General Motors Corp., 209 F. Supp. 2d 481, 486 (W.D. Pa. 2002). Under this theory, a plaintiff may prove the existence of a defect through circumstantial evidence. Id. at 487. "In order to proceed to the jury on a malfunction theory the plaintiff is required to proffer evidence that if credited negates any reasonable secondary causes of the accident." Id. "Under this theory the plaintiff need not negate every theoretically conceivable secondary cause for the accident in question; rather, the plaintiff fails to establish a prima facie case only where the offered proof in itself fairly raises the possibility of secondary causes and then fails to negate the inference that more than one cause could account for the accident." Id. (citing Dansak v. Cameron Coca-Cola Bottling Co., 703 A.2d 489, 497 (Pa. Super. Ct. 1997)). As such, "[s]ummary judgment is not warranted simply because the defendant hypothesizes (or even presents evidence of) reasonable secondary causes." Dansak, 703 A.2d at 497.

Here, Plaintiffs have presented sufficient evidence to negate the secondary causes of the bands breaking posed by Signode – that they failed at a joint or were struck by a forklift blade. See Signode's Br. at 30 (citing Farley Dep. I at 60-61). In particular, Signode relies on Farley's testimony that he witnessed the green bands breaking when they were released too soon from the machine that welds them or when someone from the warehouse has hit a band with a forklift. Farley Dep. I at 60-61. Plaintiffs' packaging expert, Dr. Paul Singh, however, opined that the "band broke after the securement straps were applied and before they were removed, sometime during . . . transit." Singh Dep. at 57-58. Dr. Singh maintained that the load was stable when

Shipman's flatbed trailer left Aquatherm's warehouse facility, because "[i]f it [was] not stable, [Shipman would not have been] able to apply the securement straps." Id. at 49.  Dr. Singh further contended that there was no forklift that could have caused the bands to break in transit or at Yates' facility and that the bands did not break due to an improper weld.  See id. at 103, 107-09, 143-44.  Thus, Plaintiffs have produced sufficient evidence to negate the alternative reasons hypothesized by Signode for the bands breaking.

Ultimately, there are outstanding issues of material fact regarding whether the plastic bands were actually manufactured by Signode and, therefore, Signode's Motion for Summary Judgment must be denied.

### C.    Arco's Motion for Summary Judgment Will Be Denied

Like Signode, Arco moves for summary judgment on the basis that the broken green bands were not preserved and, therefore, were unable to have been examined or inspected for any defects by any party.  Arco's Mem. of Law. in Supp. of Mot. for Summary J. (Doc. No. 119) at 1 [hereinafter "Arco Br."].  Arco argues that, because bands can break for a variety of reasons, and because no party had the opportunity to examine or inspect the subject bands to determine how they broke, Plaintiffs are unable to present evidence to support their claims of negligence and products liability.  Id. at 3.  As set forth below, issues of material fact exist as to Arco's liability and, therefore, its Motion for Summary Judgment will be denied.

Arco alleges that Plaintiffs' products liability claim against it fails, as a matter of law, because "there is absolutely no evidence of how the green Tenax bands failed, or when they failed.  Therefore, there is no conceivable way to determine whether or not they were defective." Id. at 7.  Moreover, Arco contends that, because Plaintiffs cannot negate a reasonable secondary cause of the failure of the green bands, they cannot meet their burden of proof.  Id. at 5-8.  Arco,

like Signode, relies on DeWeese and Roselli.  Id.  For the reasons discussed supra in Section

III.B in denying Signode's Motion for Summary Judgment, this Court will deny Arco's Motion

for Summary Judgment on Plaintiffs' strict liability claim.  While there is a genuine issue of

material fact regarding whether Signode was the manufacturer of the green bands that broke,

here, there is no genuine issue of fact that Arco supplied Aquatherm with the green bands used

on Shipman's flatbed trailer, see, e.g., Aquatherm's Rog. Answers, No. 9; Hardy Dep. at 13;

Farley Dep. I at 53; Farley Dep. II at 15-16, and the summary judgment record contains evidence

that Arco had its sales representative recommend to Aquatherm what bands to use in bundling

the pipes for shipment, Mitchell Dep. I at 66-69; Farley Dep. I at 53-54, and that Aquatherm

relied on those recommendations from Arco, Farley Dep. I at 53-54; Hardy Dep. at 15-16, 24-25.

With respect to Plaintiffs' claim of negligence, Arco contends that there is no way to

prove either breach of duty or causation "[b]ecause there has been no determination of where,

when, or how the band broke."  Arco's Br. at 8.  It is undisputed that the green bands that were

used to bundle the pipes on Shipman's flatbed trailer were distributed by Arco.  Farley Dep. I at

26.  In fact, Farley, Aquatherm's warehouse manager, testified that Aquatherm would rely on

Arco's recommendations with respect to what bands to use to bundle the pipes.  Id. at 53-54;

Hardy Dep. at 15-16, 24-25.  Dr. Singh opined as to how and when the bands broke, testifying as

follows:

> Because it is in a weak system, the tensions that recreated over the system were
> high, and those bands could not appropriately stay stable and as the plastic
> continued to degrade and maybe a poor, lousy weld joint to hold the polyester
> together, polyester itself was weak, I saw in this particular bundle there is only —
> there is five bands in some cases, three in some cases, four in some cases, so there
> is no systematic valuation of how — how many bands and the right materials to
> use, but what I know is that it could not have affected the — if a proper system had
> been designed, sir, it could not be unstable when you remove the securement straps.
>
> . . . There is no other way that you would have a bundle fall.  There is physically
> no way a bundle can fall if it is intact and if it's stable.  The only thing that makes

it unstable is a broken band.  And this is based on my research from previous
accidents.  A band has to break, because what it does it creates —these bands are
under tensions at a high tension.  When you apply a securement strap, it actually
reduces the tension.  So during transportation it will fatigue because there is still
some tension, the plastic will have a tendency to weaken, it is exposed to
temperature, it's exposed to multiple conditions.  So the bands will continue to
weaken since they're applied until the time they're removed.  Hence, this is a
system that continues to weaken and, hence, requires a safety factor, because if it's
not properly designed it can fail anywhere. But there is no evidence that any of the
pipes moved or shifted during transportation.

Singh Dep. at 51-56, 58-59.  Dr. Singh concluded that "the (Tenax) band broke after the (yellow)

securement straps were applied [but] before they were removed, sometime during transit."  Id. at

57-58.

Nevertheless, Arco alleges that "there is no way to determine whether the band broke at

the seam or elsewhere, whether it broke before, during, or after pipe shifted and began falling

onto Mr. Shipman, or whether it broke as a result of improper packaging, from a faulty seal,

from debris hitting throughout the cross-country trip, from a forklift or other machine, from Mr.

Shipman's unstrapping, or a multitude of other reasons.  Therefore, Dr. Singh's opinion that the

bands failed to contain the load when the outer straps were unsecured is based completely on

speculation."  Arco's Br. at 11.  On summary judgment, however, it is not the role of this Court

to determine whether it agrees with an expert's conclusions.  See Breidor v. Sears, Roebuck &

Co., 722 F.2d 1134, 1139 (3d Cir. 1983).  Arco's challenges to Dr. Singh's testimony and

conclusions go to the weight the jury should afford his testimony at trial and are more

appropriately addressed through cross-examination at trial, where Arco can probe the validity of

Dr. Singh's opinions in light of the fact that no party was able to inspect the green bands at issue.

Id.; see also Heller v. Shaw Indus., Inc., 167 F.3d 146, 156-57 (3d Cir. 1999); Brill v. Marandola,

540 F. Supp. 2d 563, 570 (E.D. Pa. 2008) (quoting JMJ Enters. v. Via Veneto Italian Ice, No. 97-

0652, 1998 WL 175888, at *6 (E.D. Pa. Apr. 15, 1998)).

Here, there are outstanding issues of material fact with regard to how and why the bands broke, as well as to whether the type of plastic banding supplied by Arco was proper for the unitizing of the pipes, making summary judgment inappropriate.  Therefore, Arco's Motion for Summary Judgment will be denied.

### D.      Yate's Motion for Summary Judgment Will Be Denied

Plaintiffs bring a claim for negligence against Yates alleging that it had a duty to protect Shipman, as a business invitee on Yates' property, from known dangers as well as those that may have been discovered with reasonable care.  FAC ¶ 20.  Specifically, Plaintiffs argue that Yates, the owner of the premises where Shipman was crushed, failed to warn Shipman to "not attempt to access the load of pipe without the presence of mechanical equipment" and failed to warn Shipman that the bands unitizing Aquatherm's pipes are known to break, thereby necessitating the need for mechanical equipment during unloading.  Pls.' Resp. in Opp. to Yates' Mot. for Summary J. (Doc. No. 126) at 17.  Plaintiffs maintain that Yates knew of the risk of the bands breaking, which presented a danger to Shipman.  Id.  Yates moves for summary judgment, arguing that there are no genuine issues of material fact as to whether Yates' actions or inactions caused Shipman's death.  Yates' Mem. of Law in Supp. of Mot. for Summary J. at 1 [hereinafter "Yates' Br."].  Because issues of material fact exist as to Yates' liability, it is precluded from obtaining summary judgment.

Plaintiffs assert, and for purposes of summary judgment Yates has not disputed, that Shipman was a business invitee on Yates' premises.  See Guttering v. A.P. Green Servs., Inc., 804 A.2d 643, 655 (Pa. Super. Ct. 2002) ("Employees of independent contractors . . . are 'invitees' who fall within the classification of 'business visitors.'"); see also Treadway v. Ebert Motor Co., 436 A.2d 994, 999 (Pa. Super. Ct. 1981) (plaintiff who was injured in a fall on

defendant's premises was treated as a business invitee where he was an employee of a third-party independent contractor who was visiting defendant's premises to pick up cargo and transport it to another location in his employer's tractor-trailer).  The general rule is that a possessor of land owes a duty to business invitees, such as employees of independent contractors, where a non-obvious dangerous condition exists on the possessor's land.  Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 465 (E.D. Pa. 2007) (citing Restatement (Second) of Torts § 343 (Dangerous Conditions Known or Discoverable by Possessor)).

Pennsylvania has adopted the Restatement (Second) of Torts § 343's standard for when a landowner owes (and breaches) its duty to an invitee:

> A possessor of land is subject to liability for physical harm caused to his [or her] invitees by a condition on the land if, but only if, he [or she]

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343; see Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983). "This is a narrow theory of liability."  Warnick, 516 F. Supp. 2d at 466.  Pennsylvania law, however, generally insulates property owners from liability for the negligence of independent contractors and places responsibility on the independent contractor (or its employees), since they are in control of the workplace, have expertise in the performance of the work, and are in the best position to protect themselves.  Mentzer v. Ognibene, 597 A.2d 604, 609 (Pa. Super. Ct. 1991). The landowner does not owe a duty to the contractor's employee if the defective conditions of the land are the products of the contractor's work.  Farabaugh v. Pa. Turnpike Com'n, 911 A.2d

1264, 1273 (Pa. 2006). Furthermore, the landowner "has no duty to warn the contractor or his employees of a condition that is at least as obvious [to the contractor and his employees] as it is to [the landowner]." Colloi v. Phila. Elec. Co., 481 A.2d 616, 620 (Pa. Super. Ct. 1984). However, "Pennsylvania courts have consistently held that, when employing an independent contractor, 'a [landowner] must use reasonable care to make the premises safe or give adequate and timely warning of dangers known to him [or her] but unknown to the contractor or his [or her] employees.'" Figured v. Carrizo (Marcellus), LLC, 751 F. App'x 308, 311 (3d Cir. 2018) (quoting Farabaugh, 911 A.2d at 1273). In sum, whether a property owner owes an independent contractor a duty to warn of dangerous conditions on the premises turns on whether the owner, at the time he or she enters into the contract with the independent contractor, possesses "superior knowledge," or information which places him or her in a superior position to appreciate the risk posed to the contractor or his or her employees by the dangerous conditions. Rabovsky v. Foster Wheeler, LLC, No. CIV. A. 2:10-03202-ER, 2012 WL 2913805, at *1 (E.D. Pa. June 8, 2012) (citing Colloi, 481 A.2d at 620).

Yates contends that it "was merely an entity which was receiving the delivery of the load of polypropylene pipes shipped from Aquatherm's facility in Utah," Yates' Mem. of Law in Supp. of Mot. for Summary J. at 6 [hereinafter "Yates' Br."], and that none of the expert testimony in the case indicated that Yates engaged in any actions or inactions which caused or contributed to Shipman's death, id. at 9. It is undisputed that Shipman arrived at Yates' facility sometime after the close of business on July 14, 2016, and before Yates opened for business on July 15, 2016. Yates' Mot. for Summary J. at 3. The facility was closed, the receiving yard was fenced in and locked, and no Yates employees were present. Id. Sometime between Shipman's arrival after the close of business on July 14, 2016 and approximately 7 a.m. on the morning of

July 15, 2016, Shipman began removing the securement straps which secured the bundles of pipe to his flatbed trailer, at a time when the Yates facility was closed and no Yates employees were available.  Id. at 4.  Neither Plaintiffs' trucking expert, Brooks Rugemer, or packaging expert, Dr. Singh, testified that Yates caused the accident leading to Shipman's death.  Yates' Br. at 9; see also Dep. of Brooks Rugemer (attached as Ex. 5 to Pls.' Resp. in Opp. to Yates' Mot. for Summary J.) at 137-39; see also Singh Dep. at 174-75.

In their opposition, however, Plaintiffs cite to testimony that problems with the green bands snapping in Aquatherm's loads were not uncommon, and that Yates was aware of these issues and routinely notified carriers such as Landstar of them.  Pls.' Resp. in Opp. to Yates' Mot. for Summary J. at 12-15, 19.  Plaintiffs rely on the testimony of Yates' employee Moran that Yates was long aware of problems occurring with the green bands used for Aquatherm's loads and that Yates had conversations with Landstar regarding those shipments.  For example, Moran advised that he would see green bands breaking "at least once a truckload" over the years. Moran Dep. at 13, 17.  Moran also testified that he had previously seen green bands on shipments that were broken before forklifts were used to unload the shipments.  Id. at 17-18. Moran testified that he and Batzel would routinely inform the trucking company to instruct their drivers not to unload the pipes until Yates employees could assist with a forklift "[b]ecause it had the tendency for the straps to break, and it could fall apart."  Id. at 20-22.  Indeed, Batzel testified that when Landstar called him to confirm delivery of the next shipment of pipe and asked whether Shipman could deliver it on July 14, 2016, he informed Landstar that the driver could "wait outside the parking lot' but he was "not to unstrap his load before somebody gets in the next morning on Friday."  Batzel Dep. at 55-56.  Fierro, Landstar's agent coordinating the shipment, in contrast, claims she was not advised by Yates to inform Shipman to wait to unstrap

his load.  Fierro Dep. at 30-32.  Plaintiffs' reliance on this testimony is sufficient to create a genuine issue of material fact to defeat summary judgment on Plaintiffs' negligence claim against Yates.

Here, summary judgment is inappropriate as to whether Yates breached any common law duty owed to Shipman as a business invitee.  Reviewing the evidence in the light most favorable to the Plaintiffs, a genuine factual dispute exists as to whether Yates had "superior knowledge" of the alleged tendency of the green bands used by Aquatherm to break and failed to warn Shipman of the risk of unsecuring the straps on his own, including whether Batzel informed Landstar to tell Shipman to wait to unstrap the load.  For these reasons, Yates' Motion for Summary Judgment will be denied.

### E.      Landstar's Motion for Summary Judgment is Granted in Part and Denied in Part

Landstar argues that it is entitled to summary judgment on Plaintiffs' negligence claim because it had no duty to warn Shipman of the "risks inherent in his profession and within his experience."  Landstar Br. at 11.  Landstar also alleges that it is entitled to summary judgment on Plaintiffs' negligence claim because Plaintiffs have failed to establish causation.  Id. at 14-18.  In the alternative, Landstar seeks partial summary judgment on Plaintiffs' claim for punitive damages.  Id. at 18.  As set forth below, Landstar's Motion for Summary Judgment on Plaintiffs' negligence claim will be denied, but will be granted as to Plaintiffs' punitive damages claim.

Landstar contends that, as a general contractor, it was "in an analogous position to owners of property" and that, therefore, it had no duty to warn Shipman, an independent contractor, of a condition that was at least as obvious to it as it was to Shipman.  Id. at 11 (citing Repyneck v. Tarantino, 202 A.2d 105 (Pa. 1964)).  Generally, the employer of an independent contractor has no duty to warn the contractor or his employees of a condition that is at least as

obvious to them as it is to him or her.  See, e.g., Beil v. Telesis Const., Inc., 11 A.3d 456, 460

(Pa. 2011).  In addition, the property owner is under no duty to protect the employees of an

independent contractor from risks arising from or intimately connected with defects or hazards

which the contractor has undertaken to repair or which are created by the job contracted for.

Colloi, 482 A.2d at 620.  However, as with property owners, general contractors have a duty to

warn their independent contractors when they possess "superior knowledge" of the risk or hazard

or when they have "information which places [them] in a superior position to appreciate the risk

posed to the contractor . . .  by the dangerous condition."  Id.

     Landstar alleges that Plaintiffs cannot adduce evidence sufficient to create a triable issue

as to whether it breached any duty to Shipman or whether Landstar's negligence was a factual, or

proximate, cause of Shipman's death.  Landstar's Br. at 9.  Landstar argues that, as a matter of

law, it owed no duty to control or inspect the manner in which Shipman performed his work

because "Shipman was an independent contractor with decades of experience operating a tractor

and flat-bed trailer, and specifically with experience hauling loads of pipe."  Id. at 9, 12.

According to Landstar, this experience provided Shipman with "superior knowledge" in how to

ensure his own safety on the job, as compared to Landstar.  Id. at 12.  Landstar also contends that

"the potential dangers of doing the contracted work were at least as open and obvious to

decedent Shipman as they were to Landstar, who played no part in the loading, securing or

unloading of the subject load of pipes."  Id.  Landstar maintains that the risk of the green bands

breaking was: (1) neither foreseeable nor contemplated by Landstar at the time of contracting;

(2) not different from the ordinary risks attendant to the type of work being done; and (3) created

by Shipman's collateral negligence in prematurely unstrapping the load of plastic pipes.

Landstar's Reply Br. in Supp. of Mot. for Summary J. (Doc. No. 133) at 6.

In response, Plaintiffs argue that Landstar had a duty to warn Shipman of the risks and hazards associated with releasing the securement straps overlaying the bundled pipes because Landstar knew that the bundles and bands were prone to breaking apart during transport or unloading and that there was no evidence that Shipman was aware of those same risks.  Pls.' Resp. in Opp. to Landstar's Mot. for Summary J. at 3.  Plaintiffs maintain that Landstar knew critical health and safety information that Shipman was not to release his overlaying securement straps without assistance from Yates, its employees, or forklifts, but that it never conveyed that information to Shipman.  Id. at 4.  Therefore, Plaintiffs allege that Landstar did in fact have superior knowledge of the hazards posed by the bands and, consequently, had a duty to warn Shipman of those hazards.  Id. at 21-26.  Although Landstar relies on Shipman's history as an experienced driver, Plaintiffs claim that Shipman's overall experience as detailed in his employment application provides no indication of whether he was aware of the alleged hazards associated with Aquatherm's loads in particular.  Id. at 23-24.  Plaintiffs cite to evidence that Landstar was aware of potential hazards associated with Aquatherm's loads, relying on the testimony of Yates employee Batzel, who testified that he informed Landstar to advise its drivers "not to unstrap" their loads from Aquatherm until Yates' employees were available to assist unloading the trailers.  Batzel Dep. at 55-56.  Moreover, as discussed supra in Section III.D., Yates employee Moran testified that there was a history of problems with bands breaking on Aquatherm's loads, Moran Dep. at 10, 13, 17-18, 22-25, and that carriers such as Landstar would have been advised by Yates as a matter of routine practice to inform their drivers to not unload their shipments of pipe without the assistance of Yates personnel, id. at 20-22.  In fact, Moran testified that Batzel would inform "dispatch" "every time we got a shipment of this stuff in" to not unload the pipes until Yates' employees had arrived.  Id.  There remain issues of material

fact as to whether Landstar ever communicated these warnings to Shipman or whether Shipman knew himself that the green bands used by Aquatherm allegedly had a tendency to break.

Thus, whether either Yates or Landstar had superior knowledge regarding the purported tendency of the green bands to break or snap during the unloading process, as well as whether the alleged risk was at least as obvious to Shipman as it was to Landstar, are issues of fact to be decided by the jury.  See, e.g., Guttering, 804 A.2d at 660.  Moreover, there is a genuine issue of material fact as to whether the risks posed by the green bands breaking were simply "created by the job contracted."  Landstar's Br. at 11-12 (citing Cellender v. Allegheny County Sanitary Authority, 222 A.2d 461 (Pa. Super. Ct. 1966)).

Landstar also asserts that it is entitled to summary judgment on the issue of causation, arguing that its alleged failure to convey a warning to Shipman was neither the proximate cause nor the but-for cause of the accident that led to his death.  Landstar's Br. at 14-18.  Once again, genuine issues of material fact preclude summary judgment on the issue of causation.  Moreover, to the extent Landstar contends that the accident was a result of, at least in part, Shipman's collateral negligence in prematurely unstrapping the bundles of plastic pipe, these also are genuine issues of material fact precluding summary judgment.

Landstar also seeks summary judgment on Plaintiffs' claim for punitive damages.  As discussed supra in Section III.A, punitive damages may be awarded "only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either 'the defendant's evil motive or his [or her] reckless indifference to the rights of others.'"  Phillips, 883 A.2d at 445 (citing Martin, 494 A.2d at 1096).  Here, there is clearly insufficient evidence presented by Plaintiffs to meet their burden to show that Landstar's conduct was "intentional, willful, wanton or reckless."  Id. at 446.  Plaintiffs' evidence "simply does not show a culpable state of mind on

the part of [Landstar] as required to obtain the extreme remedy of punitive damages, which are penal in nature and only proper if [Landstar's] conduct was so outrageous as to show willful, wanton, or reckless conduct." Dyvex, 2018 WL 827518, at *5; see also Vitalis, 481 F. App'x at 729. At best, Plaintiffs' evidence may establish that Landstar's conduct was negligent, but it is legally insufficient to pursue a punitive damages claim against Landstar.

## V.    **CONCLUSION**

For the foregoing reasons, Aquatherm's Motion for Partial Summary Judgment will be granted; Signode's Motion for Summary Judgment will be denied; Arco's Motion for Summary Judgment will be denied; Yates' Motion for Summary Judgment will be denied; and Landstar's Motion for Summary Judgment will be granted in part and denied in part.[2] An appropriate Order follows.


Dated:  April 27, 2020

                                        BY THE COURT:


                                        */s/ Marilyn Heffley*
                                        MARILYN HEFFLEY
                                        UNITED STATES MAGISTRATE JUDGE

---

[2]    Additionally, Plaintiffs' Objections to Defendants' Summary Judgment Evidence (Doc. No. 130) is denied without prejudice to Plaintiffs renewing their objections at trial.